UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) ) | |
| RBS SECURITIES INC., | ) ) | |
| Defendant, | ) ) | |

_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendant RBS Securities Inc., formerly known as Greenwich Capital Markets, Inc. ("RBS"):

## SUMMARY

1. This case is about certain misstatements and omissions made by RBS Securities Inc. ("RBS") to the investing public in 2007 in promoting its $2.2 billion offering of a subprime residential mortgage-backed security. As described herein, RBS misled investors about the quality and safety of their investments by claiming that the subprime loans backing the multi-billion dollar offering were "generally" in compliance with the lender's underwriting guidelines.

2. In fact, RBS knew or should have known at the time **that almost 30% of the loans backing the offering** deviated so much from the lender's underwriting guidelines that they should have been kicked out of the offering entirely.

1

3.      In May 2007, RBS offered to the investing public the opportunity to purchase certificates of a residential subprime mortgage-backed security, called Soundview Home Loan Trust 2007-OPT1 (the "Subprime Offering").

4.      A subprime residential mortgage-backed security is a security collateralized by subprime residential mortgage loans.  The loans are typically bundled together, carved into various classes (or "tranches") that provide differing levels of risk and return, and then offered as securities to the investing public (referred to as the "securitization" process).  Investors are then entitled to a percentage of the mortgage payments made each month on the mortgages backing the security, depending on which tranche they invested in.

5.      As of April 2007, RBS had successfully bid to purchase two large pools of subprime loans from Option One Mortgage Corporation ("Option One").  RBS would ultimately choose loans from these pools for its Subprime Offering.

6.      At the time of the bid, Option One was a subsidiary of H&R Block.  Option One conditioned the winning bid for the pools of subprime loans on a commitment to close the purchase by H&R Block's fiscal year-end of April 30, 2007.

7.      Constrained to close the deal by April 30, RBS hired a third party to quickly conduct due diligence on a small sample of the Option One loans prior to the Subprime Offering. That due diligence revealed that a large number of loans reviewed did <u>not</u> in fact meet Option One's "underwriting" guidelines – *i.e.*, guidelines primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan, and to assess the borrower's ability to repay the mortgage loan.

8.      RBS thus knew or should have known that almost 30% of the loans underlying the Subprime Offering likely deviated so far from the guidelines that RBS should have excluded

the loans from the offering entirely.  Simply by extrapolating from the random sample of loans reviewed in the due diligence process, it would have been evident to RBS that Option One had failed to materially comply with its underwriting guidelines for the loans underlying the Subprime Offering.

9.      Indeed, having purchased and securitized such subprime loans from Option One in the recent past, RBS was aware that the deviations for the Subprime Offering were as much as six times higher than those in prior Option One loan pools.

10.     Consistent with its rights under the contract with Option One, RBS excluded from the Subprime Offering the 186 loans that it identified in the due diligence process sample as materially failing to meet underwriting guidelines.  However, RBS failed to conduct any further diligence to exclude additional loans – despite the fact RBS knew or should have known from its diligence findings that there were likely a substantial number of additional subprime loans in the pool that materially deviated from the underwriting guidelines.  Instead, RBS simply moved forward and closed the deal with Option One.

11.     In rushing to purchase the loans from Option One, RBS failed to take adequate steps to exclude additional problematic loans from the Subprime Offering.

12.     On April 30, 2007, an RBS affiliate purchased the loan pools from Option One.  RBS subsequently securitized the loan pools, and sold the Subprime Offering to investors.

13.     As required by the Securities and Exchange Commission, RBS used a prospectus supplement (the "ProSupp") to make the Subprime Offering.  In the ProSupp, RBS included a representation from Option One that the loans included in the Subprime Offering were originated "generally in accordance with Option One's underwriting guidelines" and that "[o]n a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made [on the basis of]

compensating factors."  (In industry terms, "compensating factors" meant additional information provided to Option One that suggested a greater likelihood of the subprime borrower repaying the loan.)

14.     This representation was false and/or misleading because RBS' due diligence showed that almost 30 percent of the loans underlying the Subprime Offering deviated so much from the underwriting guidelines that they should have been excluded.

15.     Furthermore, RBS also failed to disclose to the investing public that Option One had not materially complied with its underwriting guidelines for a historically large number of loans included in the Subprime Offering.

16.     This omission was materially misleading because it created the misimpression for investors that the loans underlying the Subprime Offering were better quality than they were and would have had a greater chance of being repaid than they did in reality.

17.     While investors understood that subprime mortgage-backed securities offerings carried a measure of risk, the application of underwriting guidelines to each mortgage loan provided some assurance to investors in subprime offerings that the loans were made in a fashion consistent with Option One's policies and procedures and would make it more likely that they would be repaid.

18.     RBS knew or should have known that the representation included by RBS in the ProSupp about loans "generally" meeting guidelines was materially inaccurate and would mislead investors about the relative level of investment risk of the Subprime Offering.

19.     Indeed, the loans in the Subprime Offering performed poorly.  As a result of RBS's failure to replace the loans that materially deviated from the guidelines with acceptable loans, investors in the Subprime Offering have lost at least $80 million to date.

4

20.     By engaging in the conduct alleged herein, RBS violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) & 77a(a)(3)].

21.     As a result of RBS' conduct, the Commission seeks entry of a final judgment ordering injunctive relief, ordering the payment of disgorgement and pre-judgment interest, and imposing civil penalties.

## JURISDICTION AND VENUE

22.     The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] to enjoin Defendant from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and for disgorgement, civil penalties and other equitable relief.

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and Sections 20(b) and (d) and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d) and 77v(a), 77v(c)].

24.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) and Section 22(a) of the Securities Act [15 U.S.C. §§78aa], because certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the District of Connecticut, and because RBS' principal place of business is in the District of Connecticut.

25.     In connection with the conduct alleged in this Complaint, Defendant directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

26.     Unless enjoined, Defendant will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

**DEFENDANT**

27.     RBS Securities Inc. is a broker-dealer registered with the Securities and Exchange Commission and based in Stamford, Connecticut.  At pertinent times in 2007, RBS was known as Greenwich Capital Markets, Inc., which was a direct wholly-owned subsidiary of Greenwich Capital Holdings, Inc.  Greenwich Capital Holdings, Inc. in turn was a wholly-owned subsidiary of the Royal Bank of Scotland plc.  RBS was very active in the subprime market.  RBS sponsored residential mortgage-backed securities for subprime mortgage lenders (such as Option One).  RBS and/or its affiliates also purchased pools of loans from subprime lenders and offered residential mortgage-backed securities, as well as financed residential loans by subprime lenders.

**RELEVANT ENTITY**

28.     Option One, now known as Sand Canyon Corporation, is a California Corporation with headquarters in Irvine, California.  Option One is an indirectly wholly-owned subsidiary of H&R Block, Inc. ("H&R Block").  From 1993 through 2008, Option One originated and serviced subprime loans.  Option One also established trusts to sell residential mortgage-backed securities to investors and sold loan pools to entities such as RBS and/or its affiliates.

**FACTUAL ALLEGATIONS**

**A.  RBS' Involvement in the Subprime Mortgage-Backed Securities Market**

29.     By April 2007, RBS was one of many broker-dealers offering subprime residential mortgage-backed securities to the investing public.  In industry terms, RBS and/or its affiliates often purchased "whole loans" – meaning pools of individual loans made by subprime mortgage companies to homeowners for the purchase of real property – and would then securitize the whole loan pools, which would then be offered to investors under the name "Soundview."

30.     Several RBS divisions were involved in this process as of 2007:  Asset-Backed Finance structured the whole loan bid, had responsibility for marketing the securitization, and helped prepare the Subprime Offering documents for RBS; Asset-Backed Trading executed the trade; Credit conducted diligence on the loans to be purchased; and Legal and Compliance advised RBS on various offerings, including residential mortgage-backed security transactions.

**B.  RBS' Due Diligence Practices**

31.     As of April 2007, RBS had a policy and practice of conducting due diligence on a sample of the mortgage loan files when it purchased subprime whole loan pools.  The RBS Credit Procedures Manual stated that the goals of due diligence were to (1) test whether the loans met the lender's underwriting guidelines, (2) determine whether the loans conformed to representations made about them in the "risk disclosure statement," and (3) assess risk areas which were not disclosed and which were not apparent from the tape data.   ("Tape data" (or "loan tapes") is the industry term used to describe spreadsheets that contain rows and columns of statistics about each mortgage loan that serves as the underlying collateral in an offering.)

32.     In fact, in an April 2007 credit report, RBS claimed that by conducting due diligence, it gained "further insight" into the "quality of loans" at an "early stage."

33.     In conducting due diligence on a selected portion of mortgage loan files, RBS employed two methods widely used in the industry: random sampling and adverse sampling.

34.     To create the random sample, RBS utilized a computer program that first ranked the loans by size and then randomly selected approximately 150 loans.  Under RBS's credit policy, the random sample had to be "at least as large as a statistically significant sample size assuming a 95% confidence level and a 10% error rate (+/-5%)."  The purpose of conducting due

diligence was to review a statistically significant random sample of the underlying loans, which permitted RBS to extrapolate the due diligence results to the rest of the loan pool.

35.     As to the adverse sample, RBS' head of Diligence selected the adverse sample for subprime loan pools, with the goal of targeting and removing the riskier loans.  The head of Diligence targeted loans that fell into various risk categories, such as loans with a high loan-to-value ratio (meaning that the loan was at or near the value of the property being mortgaged).

36.     RBS often used a third party vendor (the "Diligence Firm") to perform due diligence on the loans that served as collateral for residential mortgage-backed securities, and would then review the Diligence Firm's findings.  The Diligence Firm reviewed the applicant's loan file, which contained substantial information about the applicant's background and information about the loan sought.  For example, a loan file could include information about the applicant's job, income, prior mortgage or rental history, and other credit history (including foreclosure or bankruptcy history) and also could include documentation such as appraisals, verification of income, and other documents supporting the loan application.

37.     The explicit goal of due diligence for both RBS and the Diligence Firm was to determine whether each loan met the lender's underwriting guidelines.  Accordingly, during the due diligence process, each sampled loan was graded on a scale from 1 through 3, with the "3" classification meaning that the loan failed to meet guidelines in a material way and should be excluded from the pool.

38.     RBS' credit policy required the diligence group to report the due diligence results to others involved in the deal.  The policy stated that with respect to the random sample, when "significant material exceptions are found (typically greater than 20%), the sample size should be

expanded and may consist of additional random selections and/or discretionary samples focusing on the issues raised by the original random [sample]."

39.     In late 2006, RBS began increasing the size of its loan file due diligence sample on whole loan purchases (primarily adverse sampling), and by early 2007, the practice at RBS was to sample at least 25% of the loans contained in whole loan purchases.  In fact, an April 2007 marketing presentation to potential investors stated that RBS conducted diligence on "typically 25 to 35% [of the sample], though RBS… reserves the right for 100% review based on findings or pool size."

40.     In early 2007, RBS also began increasing the amount of so-called "valuation diligence" it conducted.  RBS had typically conducted drive-by appraisals on a limited number of loans in each pool to assess whether the appraisal was supported by the collateral.  In 2007, RBS began using a third party vendor to conduct automated valuation model appraisals ("AVMs") on a larger number of loans in whole loan pools.  If the results showed a large disparity (such as 15%) between the AVM and the originator's appraisal, RBS would generally ask for a broker price opinion ("BPO") on the loan.  RBS would then kick out loans with large disparities (such as 15%) between the BPO and the originator's appraised value that could not be reconciled.

41.     RBS did <u>not</u> conduct the AVM appraisal process on the Option One loans underlying the Subprime Offering, but instead conducted "drive-by" appraisals on a limited number of loans.

### C.  RBS' Profitable Relationship with Option One and Problems with Option One's Underwriting Standards

42.     From 1999 to 2007, RBS had a highly lucrative business relationship with Option One.  By 2007, RBS and/or its affiliates were lending approximately $3 billion annually to

Option One to allow it to originate more mortgages (referred to as "warehouse financing"), had bought many whole loan pools from Option One to securitize and was routinely offering Option One securitizations to the investing public.  According to an RBS memorandum, Option One was a "core warehouse and securitization customer."

43.     By early 2007, Option One was financially struggling.  According to an April 2007 RBS credit memorandum, Option One had "stretched" its subprime loan underwriting guidelines to be more lenient in an effort to originate more mortgages.  RBS observed in the memorandum that the "stretched loan underwriting guidelines" led to "elevated levels of early payment defaulted loans" and a "high level of delinquencies" in the market.  According to RBS, this impacted Option One's profitability and also lowered the value of subprime loans as investors priced in the weaker loan performance and the expectation of higher rates of early payment defaults.  RBS further stated in the memorandum that Option One had begun to "stretch" its guidelines as early as May 2005.

44.     By late 2006, Option One was tightening its underwriting guidelines to improve the quality of the loans, but it still needed to sell or securitize the loans originated under its "stretched" guidelines.  By April 2007, Option One was put up for sale by its parent company, H&R Block – and on April 20, 2007, H&R Block announced a definitive agreement to sell Option One.

45.     In March 2007, Option One asked RBS whether it wanted to "tak[e] down" (i.e., buy) Option One's "entire inventory" of subprime loans – about $8 to 9 billion in total – which would allow Option One to "get rid of it all and … move on and focus on future [loan origination]."  RBS did not purchase Option One's entire inventory, but in April 2007, it did

sponsor three Option One deals containing roughly $3.5 billion in loans (the "April 2007 Option One Subprime Deals").

46.     RBS conducted due diligence on random and adverse samples for all three April 2007 Option One Subprime Deals.  RBS employees – including the employee leading the diligence process on the Subprime Offering (the "Diligence Lead") – identified elevated exception rates in connection with these Deals and expected similarly elevated exception rates on loans of like vintage remaining in the inventory.

47.     On April 14, the Lead Banker on the Subprime Offering cautioned in an e-mail that the due diligence results for Option One "lately have been ugly" and further explained:

> [The] problem is that the old stuff on their [warehouse] line included a lot of high LTV [loan-to-value] loans they are trying to get rid of.  The [2007 Option One Subprime Deals] and latest $2.4 bill[ion] pool are a cleanup of Option One's warehouse lines. These dili[gence] results are non-standard even for Option One … the results have been worse than usual solely b[ecause] of a warehouse cleanup and … once these loans get cleaned up we fully expect to see decent … results in the future (esp[ecially] w[ith] some of the [underwriting] guidelines changes)."

**D.  RBS Successfully Bids for Over $2 Billion in Option One Subprime Loans**

48.     On or about April 3, 2007, Option One solicited bids from RBS and another large bank on two pools of loans valued at $2.4 billion consisting of approximately 11,000 loans, with the stipulation that the transaction must settle by April 30, 2007 (H&R Block's fiscal year-end).

49.     RBS had a financial incentive to win this bid from Option One, since the winner of the nearly-11,000 Option One loan pool bid would have the opportunity to securitize and offer to the investing public another billion-dollar pool of subprime loans from Option One.

50.     Option One internally referred to this potential transaction as the "world's biggest loan sale."

51.     On April 5, 2007, the RBS Lead Banker explained that: "The point of the trade is that [Option One] needs loans off the balance sheet before month end (for warehouse line constraints and the fact that April 30 is Block's month end… [and] … this trade … allows them to move all their old inventory of loans ($6.5 bill[ion]) off their balance sheet this month."

52.     When constructing its bid for the $2.4 billion in subprime loans, RBS considered how much loan file due diligence it should propose doing.  On April 9, 2011, the Whole Loan Trader communicated that the loan file diligence would be "limited to 25%" of the pool (or about 2,800 loans).

53.     On or about April 11, 2007, RBS' head of Credit and the head of Diligence communicated with employees in Asset-Backed Finance and Asset-Backed Trading and recommended that the sample size for due diligence should be at least 25% with the ability to expand if necessary.  In particular, the head of Credit cautioned that the chances of reviewing such a large sample by April 30 were "10% at best" in light of the Diligence Firm's likely inability to review a larger volume of loans in such a short time period.  However, as of April 11, RBS had less than 19 days to complete the entire diligence process and close the whole loan purchase because RBS understood that Option One wanted these loans off its books by April 30, when H&R Block's fiscal year came to a close.

54.     Later in the day on April 11, RBS employees met to finalize the plan for the Option One bid.  At this meeting, as reflected in e-mails sent contemporaneously, RBS decided to reduce the sample size for due diligence from the proposed 25% (approximately 2800 loans) to about 9% (approximately 1,000 loans).  The Lead Banker then sent a proposal to Option One for a bid that included diligence on 1,000 loan files.

55.     As the head of Diligence later commented:  "I think [an RBS employee] had said
... that's why we had to reduce the sample size; to be competitive."

56.     On April 13, 2007, Option One accepted RBS' bid.

**E.  RBS' Due Diligence Reveals Option One's Failure to Comply with Underwriting
Guidelines**

57.     After winning the Option One bid, RBS oversaw the due diligence process on the
Subprime Offering, including both random and adverse sampling.  RBS selected 150 loans for
the random sample, which was sufficient to extrapolate to the rest of the loans in the pools.  As
to the adverse sampling, although the head of Diligence normally selected the criteria for
subprime pools, another RBS employee was tasked by RBS to select the adverse sample for the
Subprime Offering.  Moreover, although the head of Diligence had included first-time home
buyers as an adverse criteria when conducting diligence on subprime pools since early 2007 (due
to strong correlation with early payment defaults), and the Diligence Lead had found significant
problems with first-time home buyers when conducting diligence on the April 2007 Option One
Subprime Deals, RBS decided not to include first-time home buyers as an adverse criteria for the
Subprime Offering.

58.     The adverse criteria included a selection of loans with a credit score of 500 or
less, loans with a loan-to-value ratio greater than 100% (i.e., where the mortgage exceeds the
property's value), loans originated seven months or more earlier, loans with a balance of $1
million or higher, and loans with no documentation of income and assets.

59.     After viewing the proposed adverse sample, the Diligence Lead sent an e-mail to
his RBS colleague who declined to select first time home buyers as an adverse criteria, asking:
"You like it when I'm fired up, do you?  [Be]cause I'm p!ssed right now."  Evidently frustrated
that first-time home buyers ("FTHBs") were not included as an adverse criteria in the sample, the

Diligence Lead further wrote: "I'm kicking out FTHBs like they had smallpox over here and we're spending 60% of a limited diligence on 8 month old loans, which will require probably 5 or 6 sets of guidelines just to underwrite . . . Who (*sic*) got Jameson's?"

60.    The Diligence Firm began reviewing loan files on April 16 and was under acute time pressure from RBS to complete the review by the following week.  In total, the Diligence Firm graded more than 400 loans of the 1000 as "3s" (meaning, loans that failed to meet guidelines in a material way and should be excluded from the pool).  By on or about April 24, the Diligence Lead at RBS had reviewed the "3" loans and decided that nearly half should remain classified as "3s" and be "kicked out" of the pool for the Subprime Offering.

61.    The results of the diligence process used by RBS, which included both internal reviews and the report from the Diligence Firm, revealed that more than 30% of the loans in the random sample so deviated from the guidelines that they were graded "3" and kicked out of the pool.

62.    The random sample was statistically significant – meaning that the sample was large enough to provide sufficiently precise estimates -- and therefore, the results could be extrapolated to the remainder of the 11,000 loans that comprised the Subprime Offering but were not subjected to the diligence process.

63.    The random sample diligence results communicated to RBS by the Diligence Firm provided RBS with all of the information required to extrapolate the results to the rest of the loan pool for the Subprime Offering.  Had RBS extrapolated those results, RBS would have known that the remainder of the subprime loans likely contained similar percentages of loans that did not comply with Option One's guidelines and that so deviated from the guidelines that they should be excluded from the pool.

64.     Overall, the diligence results for the Subprime Offering were up to six times worse than the most recent Option One subprime pools securitized off the Soundview shelf by RBS in June 2006.

**F.   RBS Launches Subprime Offering Without Further Diligence or Disclosure About Option One's Failure to Comply with Its Underwriting Guidelines**

65.     On April 26, 2007, the head of Diligence reported to RBS credit officials that the Diligence Lead had excluded nearly 200 loans from the pool and noted that loans for first-time home buyers had a high exception rate.  The head of Diligence also reported to Credit that 1,485 of the loans in the Subprime Offering were first-time home buyers.

66.     Later that day, the Lead Banker scheduled a meeting with, among others, the Legal and Credit departments at RBS to discuss the due diligence results for the Subprime Offering.  The Lead Banker explained that "[w]e are trying to finalize the pool tomorrow (trade settles Monday) and market the related deal on Monday as well."  After scheduling the meeting, the Lead Banker e-mailed the head of RBS' Asset-Backed Finance group and summarized the concerns expressed internally at RBS about the due diligence on the Subprime Offering.  In this e-mail, the Lead Banker also mentioned Credit's "mention[ing] wanting to do post-closing diligence" and warned that additional due diligence would "blow up this trade as Option One is not expecting that."  He continued:

> This is [H&R] Block's year end and [Option One] needs these loans off their books. [The Whole Loan Trader] and I will be on a call tomorrow [with] credit and legal. Hopefully we can convince everyone to move forward[,] otherwise we may need your help.

67.     In advance of the meeting, the Lead Banker sent and received emails with the subject line, "Option One Diligence Summary" and an attachment titled "2007 Option One Diligence Results.xls."  The Lead Banker, the Head of Credit, an RBS attorney, and others

received the diligence results.  On Friday, April 27, before the meeting occurred, the Lead

Banker stated in an e-mail to other RBS employees involved in the Subprime Offering that one

diligence summary "doesn't help."  However, RBS was out of time to conduct more diligence

before the April 30th deadline to complete the purchase of the Option One loans.

68.     On information and belief, the Lead Banker, along with Credit and Legal staff at

RBS, justified proceeding with the Subprime Offering without more due diligence or disclosure

about conformity to underwriting guidelines in part because Option One was taking the

"residual" on the deal – meaning, an investment in the lowest tranche of the Subprime Offering –

and because the deal had some protection for RBS investors in the case that certain of the loans

defaulted within the first 45 days after the deal closed.

69.     Shortly thereafter, the Lead Banker conveyed the decision to move forward with

the Subprime Offering to the head of RBS' Asset-Backed Finance group, and indicated that he

was "fine" with moving the Subprime Offering forward.

70.     Ultimately, RBS failed to conduct more diligence on the loans underlying the

Subprime Offering despite its policy requiring its employees to do so after finding more than

20% of material exceptions ("3" loans) in the random sample.  RBS also did not seek to exclude

additional assets from the securitization (such as first-time home buyers' loans) or enhance

disclosure to the investing public concerning the high percentage of loans classified as material

exceptions.

71.     On or about April 29, 2007, outside counsel distributed to RBS and Option One,

among others, a preliminary ProSupp for the Subprime Offering.  The ProSupp draft was based

on the most recent subprime offering marketed as a "Soundview" offering by RBS, and

summarized the main terms of the Subprime Offering.  Among other things, the ProSupp

described the risk factors and the mortgage pools, and identified the originator and issuing entity.
It also included the standard description of underwriting standards:

> "The Mortgage Loans will have been originated generally in accordance with Option
> One's Non-Prime Guidelines (the 'Option One Underwriting Guidelines'). The Option
> One Underwriting Guidelines are primarily intended to assess the value of the mortgaged
> property, to evaluate the adequacy of such property as collateral for the mortgage loan
> and to assess the applicant's ability to repay the mortgage loan. . . . On a case-by-case
> basis, exceptions to the Option One Underwriting Guidelines are made where
> compensating factors exist."

72.     The ProSupp further stated that "Option One Underwriting Guidelines require that
mortgage loans be underwritten in a standardized procedure which complies with applicable
federal and state laws and regulations and require Option One's underwriters to be satisfied that
the value of the property being financed, as indicated by an appraisal that supports the loan
balance."  RBS included a further representation from Option One that its Underwriting
Guidelines require a "reasonable determination of an applicant's ability to repay the loan."

73.     The language used by RBS in the ProSupp provided to investors describing the
mortgage loans underlying the Subprime Offering as "originated generally in accordance with
Option One's Non-Prime Guidelines" was virtually unchanged from prior Soundview subprime
offerings backed by Option One loans that had far lower rates of material loan exceptions.

74.     Moreover, while RBS eventually re-ordered the risk factors in the ProSupp to
rank first and expand the section concerning loans with high loan-to-value ratios, the ProSupp
did not disclose to the investing public the startlingly high number of loans that failed to meet
guidelines in a material way (approximately 3 out of 10) discovered in the random sample during
due diligence on the Subprime Offering.

75.     On or about April 29, 2007 the Lead Banker, the RBS attorney, and others were
asked to comment on the ProSupp.  On information and belief, neither the Lead Banker, nor the

RBS attorney, nor any other RBS employee suggested altering the key disclosure that the loans included in the Subprime Offering "generally" met Option One's underwriting guidelines.

76.     In May 2007, RBS launched the Subprime Offering, and, on information and belief, earned a total of approximately $4.4 million for its role as "lead underwriter" on the transaction.

77.     The total original loan value of the Subprime Offering was approximately $2.2 billion.  As a result of RBS's failure to replace the loans that materially deviated from the guidelines with acceptable loans, investors in the Subprime Offering have lost at least $80 million to date.

78.     By proceeding with the Subprime Offering under these circumstances, RBS negligently included materially misleading statements in the ProSupp concerning loan quality to sell the Subprime Offering to investors, and it obtained money by means of those false statements.

79.     RBS personnel exercised control over the drafting of an approval of the Pro Supp.  Among other things, RBS' name was prominently placed on the ProSupp's front page, and RBS was identified as the underwriter on the document.

80.     The ProSupp disclosure that loans "will have been originated generally in accordance" with Option One's underwriting guidelines was misleading.  Based on the results of the random sample – which could be extrapolated to the remainder of the Subprime Offering according to RBS's own policy – RBS knew or should have known that the Subprime Offering contained a substantial number of loans that did not meet guidelines and that so deviated from the guidelines that they should have been excluded.

81. The disclosure that loans were originated "generally" in accordance with the guidelines was materially misleading because RBS knew or should have known that almost 30% of the loans in the pool should have been excluded because they materially deviated from the underwriting guidelines.

82. Moreover, RBS acted negligently by securitizing the loans graded "3" in the Subprime Offering, rather than either kicking the loans out of the pools purchased from Option One or keeping them on the books of RBS.

<u>**First Claim for Relief**</u>
**(Violation of Section 17(a)(2) and (3) of the Securities Act)**

83. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 82 above as if set forth fully herein.

84. From in or about April 2007 through in or about May 2007, Defendant RBS, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

   a. obtained money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   b. engaged in transactions, practices or courses of business which would or did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

85. By reason of the foregoing, Defendant RBS, directly and indirectly, has violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77a(a)(2) and 77a(a)(3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunction restraining Defendant and each of its agents, servants, employees and attorneys and those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77a(a)(2) and 77a(a)(3)].

B.      Require Defendant to disgorge its ill-gotten gains**,** losses avoided, or unjust enrichment, plus prejudgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C.      Require Defendant to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §§77t(d)];

D.      Grant such other and further relief as the Court deems just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,


**SECURITIES AND EXCHANGE
COMMISSION**

By its attorneys,



/s/ *Rua M. Kelly*
_____

Rua M. Kelly (Mass. Bar No. 643351)
Kerry Dakin (Mass. Bar No. 640826)
James Goldman (Mass. Bar No. 648488)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8941 (Kelly direct)
Facsimile:   (617) 573-4590
E-mail:  kellyru@sec.gov

Local Counsel:



/s/ *John B. Hughes*
_____

John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373

Dated:  November 7, 2013